IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Sofia Sami,

        Plaintiff,

v.

The Board of Trustees of the University of Illinois,
University of Illinois Hospital & Health Sciences System, Joseph Cooper,
and Eitan Kimchi.

        Defendants.

## COMPLAINT

The plaintiff, Dr. Sofia Sami ("Plaintiff" or "Plaintiff"), by and through undersigned counsel, brings

claims against the defendants Joseph Cooper and Eitan Kimchi for race discrimination, including

associational discrimination, and against the defendants, the Board of Trustees of the University of

Illinois and the University of Illinois Hospital & Health Sciences System ("UI Health")(all defendants

jointly referenced as "Defendants") for discrimination on the basis of race, ethnicity, religion, national

origin, and sex, including associational discrimination claims, as well as violations of the Illinois

Whistleblower Act, and in support of those claims, states as follows:

### SUMMARY OF CLAIMS

1. This case results from Defendants' persistent and escalating harassment of Plaintiff in UI

   Health's Psychiatry Residency Training Program, resulting in her constructive discharge from the

   position of Chief Resident, her non-hire to a faculty position, as well as retaliation post-

   employment.

2. Upon her promotion to the Chief Resident position, following exemplary performance reviews,

   newly-appointed Program Director Dr. Eitan Kimchi and Associate Program Director Dr.

1

Joseph Cooper imposed new responsibilities on Plaintiff that were not imposed on her similarly-situated non-Muslim and non-Pakistani peers, subjected her performance to unprecedented scrutiny, and denied her basic training mentorship, support, and training opportunities.

3. After Plaintiff submitted complaints about discrimination and reported a safety violation, Program leadership and faculty disparaged Plaintiff among other supervisors, characterized her request for support during Israel's ongoing bombing of Gaza as "offensive and threatening," refused to work with her, and encouraged others to refuse to work for her.

4. Despite the fact that Plaintiff reported this harassment and exclusion through multiple complaints, Defendants failed to intervene and ensure Plaintiff equal access to the conditions and benefits of employment in the Psychiatry Residency Training Program.

5. Defendants also declined to offer Plaintiff a faculty position because of her complaints and protected characteristics, and later refused to provide her the job benefit of reference paperwork in response to inquiries from potential employers.

**PARTIES**

6. Plaintiff is a physician currently residing in Murphysboro, Illinois. Between June of 2020 and July 2024, Plaintiff conducted her residency training as an employee at the University of Illinois at Chicago's Psychiatry Residency Training Program with Defendants located in Chicago, Illinois.

7. Defendant the Board of Trustees of the University of Illinois ("UI") is a public university and federally funded institution located in Chicago, Illinois. At all relevant times, UI sponsored and conducted its residency program ("Psychiatry Residency Training Program" or "Program") through the University of Illinois Hospital & Health Sciences System. UI Health employed Plaintiff as a medical resident between June 2020 to July 2024.

8. Defendant Dr. Eitan Kimchi served as Director of the Clinician Educator Track of the Program beginning in 2023. He was promoted to Program Director in or about May of 2023.

9.  Defendant Joseph Cooper served as both Associate Program Director and, later, Program Director, during Plaintiff's residency training.

## JURISDICTION AND VENUE

10. This Court's jurisdiction over the subject matter of this action is invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

11. Venue is proper under 28 U.S.C. § 1391(b) because Defendants are located in the Northern District of Illinois and the unlawful employment practices alleged herein took place in this district.

12. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about November 27, 2024, alleging discrimination and retaliation. The charge was assigned charge no. 440-2025-01942.

13. Plaintiff filed a second Charge of Discrimination with the EEOC on or about February 28, 2025, alleging further retaliation. The charge was assigned charge no. 440-2025-05183.

14. The EEOC issued a Notice of Right to Sue for charge no. 440-2025-01942 on March 23, 2026 after the EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge.

15. The EEOC also issued a Notice of Right to Sue for charge no. 440-2025-05183 on May 11, 2026.

16. Plaintiff's Charges were cross-filed with the Illinois Department of Human Rights ("IDHR"). On June 5, 2026, Plaintiff provided a copy of the EEOC's Notice of Right to Sue for Charge No. 440-2025-05183 to the IDHR and requested that the IDHR adopt the EEOC's findings. The IDHR has not yet issued a right to sue for Plaintiff's Illinois Human Rights Act claims.

## FACTS COMMON TO ALL CLAIMS
### Background and Performance

3

17. Plaintiff is a Pakistani Muslim woman and is readily identifiable as South Asian. At all relevant times to this pleading, Plaintiff wore *hijab*, a head covering commonly worn by Muslim women.

18. Plaintiff began her residency training at UI Health's four-year Program in June of 2020.

19. During her first three years of residency, Plaintiff distinguished herself as one of the most accomplished residents in the Program. She received consistently exceptional written performance evaluations from nearly every supervising attending physician. Written evaluations described her as performing "far above the level expected," being "one of the most competent residents in the program," having "great potential as a physician leader," and being "an absolute delight" to work with.

20. In 2022 and 2023 respectively, Plaintiff was accepted into three fellowships: the Women's Mental Health Fellowship,  the American Psychiatric Association Substance Abuse and Mental Health Services Administration Minority Fellowship, and the American College of Psychiatry Laughlin Fellowship. The latter two were prestigious national fellowships awarded to a highly limited pool of trainees.

21. In or around January of 2023, because Plaintiff was very interested in teaching in the university setting, she also applied for the Clinician Educator Track overseen by Dr. Kimchi, who at the time served as the Director of the Clinician Educator Track. Upon information and belief, between June of 2020 and March of 2023, every medical resident other than Plaintiff who applied to participate in this program was accepted into the program.

22. Although Dr. Kimchi verbally approved Plaintiff's proposal and encouraged her to apply, he rejected her comprehensive and well-supported application as "too ambitious." When Plaintiff submitted a second application, she was notified that she needed to undergo special review and approval requirements, including a presentation before the full Clinician Educator Track

Committee before being permitted to participate in the program. Plaintiff participated in these processes and was ultimately accepted into the Clinician Educator Track.

23. Upon information and belief, no non-Muslim, non-South Asian applicant was required to undergo comparable scrutiny or processes before being accepted into the program. At the time, Plaintiff informed the committee she presented her second application to that she believed she was being held to a higher standard because of her identity as a member of a minority group.

24. In or about March of 2023, Plaintiff was elected by her co-residents to serve as Chief Resident alongside two of her non-Muslim, non-Pakistani co-residents, a role that carried a stipend increase and additional responsibilities. Because of her reputation as a strong mentor and interest in academia, the chief residents selected Plaintiff as Chief Education Resident.

25. In or about August of 2023, Associate Program Director Dr. Cooper pointedly asked Plaintiff if she would be interested in joining UI Health as a member of the faculty after her graduation in June of 2024. Upon information and belief, chief residents who were offered positions would be invited to formally apply during the spring recruitment process.

26. In May of 2023, UI Health reduced Plaintiff's and the other co-chief residents' clinical duties by one hour to accommodate their Chief Resident responsibilities. Dr. Robert Marvin, who served as Program Director during most of Plaintiff's training, assigned those responsibilities equally among the co-chief residents and ensured that chief resident duties remained limited to residency-related responsibilities rather than department-wide administrative functions.

27. In or about June of 2023, Program Director Dr. Marvin stepped down from his role as Program Director of the residency program.

**Dr. Kimchi's Harassment of Plaintiff**

28. In June of 2023, Dr. Kimchi was appointed as Program Director of the Program.

29. Dr. Kimchi repeatedly signaled consciousness of Dr. Kimchi's religion, assumed national origin, and ethnic associations. Immediately following his appointment as Program Director, Dr. Kimchi began making enthusiastic, unsolicited references to Plaintiff's Muslim faith and ethnicity in a manner that exceeded ordinary workplace conversation. For example, upon seeing her on the day after Eid, he asked Plaintiff what it was like "praying outside" on Eid. Dr. Kimchi did this without having established any rapport with her about her attendance of Eid prayer.

30. As another example, Dr. Kimchi, whose name is Hebrew, repeatedly directed other employees and residents at Plaintiff to "ask Sofia" how to pronounce his name. Upon information and belief, Dr. Kimchi continually instructed other staff to ask Plaintiff about how to pronounce his name because Plaintiff was Muslim and wore *hijab*, and assumed she knew Arabic which, like Hebrew, is a Semitic language. Plaintiff has no special knowledge about how to pronounce Dr. Kimchi's name, nor does she speak Arabic or Hebrew. Rather, Plaintiff is South Asian and of Pakistani descent, with linguistic traditions that are distinct from the Arabic and Hebrew languages and which are not Semitic.

31. Also following Dr. Kimchi's appointment to program director, Dr. Kimchi began assigning Plaintiff a disproportionate amount of work compared to her co-chief residents, including tasks well beyond the scope of her role as a chief medical resident. For example, he assigned Plaintiff the responsibility of booking rooms for department-wide programs and serving as the de facto point person for a wide range of departmental functions unrelated to her training, so much so that she was regularly being pulled out of her classes for administrative inquiries and had staff and medical residents routinely show up at her office with administrative requests.

32. Noticeably, despite the already demanding clinical and administrative responsibilities of both residency and being a chief resident, Dr. Kimchi increasingly delegated to Plaintiff responsibilities that belonged to the Program Director. For example, Defendants assigned

Plaintiff the responsibility of creating quality improvement measures as well as teaching and instructional workflows for the entire department. Defendants did not similarly assign other non-Muslim and non-South Asian chief residents this full range of duties.

33. As another example, Dr. Kimchi directed all residents in the department to contact Plaintiff directly if they were ever absent from a lecture, creating a continuous stream of additional responsibilities for Plaintiff to address. Defendants' expectations significantly increased Plaintiff's workload and diverted substantial time and attention away from her clinical training and core residency duties, leaving Plaintiff in a near-constant state of stress and anxiety.

34. Plaintiff immediately reported her concerns about the disparate and excessive workload to Dr. Joseph Cooper, Associate Program Director and Vice Chair of the Department's Education, but Defendants continued to expand Plaintiff's duties beyond the scope of her chief resident role.

35. In or about August of 2023, Plaintiff raised her concerns regarding the excessive assignments to the UI Health's Psychiatry Department's Chair, Dr. Anand Kumar, who is not Pakistani and, upon information and belief, not Muslim. Plaintiff explained that the assignments were inequitable and that her co-chief residents did not receive similar assignments. Dr. Kumar, who is male, responded by suggesting that Plaintiff must have an emotional attachment to the former program director, Dr. Marvin. Dr. Kumar did not meaningfully address Plaintiff's complaints.

36. Upon information and belief, Dr. Kumar was not similarly dismissive regarding complaints launched by male residents.

37. Upon information and belief, Plaintiff's complaints were shared and discussed amongst the Program's leadership and faculty, including Dr. Joseph Cooper, Dr. Kimchi, Dr. Mulvihill, and Associate Program Director Dr. Tammy Tamayo.

7

38. In or about August and September of 2023, Dr. Kimchi began a pattern of publicly volunteering Plaintiff for extraneous tasks. In one instance when Plaintiff declined an extraneous task, Dr. Kimchi became visibly angry.

39. In or about August of 2023, Dr. Kimchi told faculty that Plaintiff was "revamping" the entire curriculum, a responsibility she was not aware of until informed by third parties. Dr. Kimchi's additional assignments made Plaintiff's training unbearable.

40. In or about August or September of 2023, while on a rotation with Dr. Cooper, Dr. Cooper told Plaintiff that "he is fascinated by the bilingual brain" after observing her speaking Urdu. Upon information and belief, no similar comments were made to Plaintiff's bilingual co-residents who spoke languages other than English.

41. Dr. Cooper and others also e-mailed Plaintiff tedious requests and subjected her to greater scrutiny than her counterparts, at times seeking explanations for information that was either plainly available or requiring Plaintiff to answer questions that did not reasonably require her involvement, further increasing Plaintiff's workload.

42. Plaintiff complained to the Office of Graduate Medical Education ("OGME") about the disparate and excessive assignments.

43. On September 29, when the growing responsibilities Defendants continued to place on Plaintiff severely affected her health and wellbeing, and after receiving permission from the OGME, Plaintiff resigned from her position as Chief Resident and cited Program challenges that made continuing the role not possible.  Despite the significance of her resignation and the concerns she raised, Plaintiff received only a brief acknowledgment of receipt and no substantive follow-up from Program leadership**.**

44. The Program leadership filled the vacancy with Plaintiff's co-resident, Dr. Victor Valencia. He is a male, non-Muslim, non-Pakistani resident who did not similarly complain of discrimination.

Dr. Valencia was not tasked with the same administrative duties imposed on Plaintiff, such as facilitation of simultaneous courses, management of quality improvement projects, creation of teaching schedules, troubleshooting administrative rotation issues, and booking rooms. Dr. Valencia was also not subject to the same scrutiny as Plaintiff.

45. Both prior to and following Plaintiff's resignation, several of her co-residents and faculty members internally reported the hostility against Plaintiff they had witnessed.

46. Upon information and belief, Associate Residency Training Director Dr. Mulvihill, who is not South Asian or Muslim, cautioned faculty members to "be careful of who you hitch your wagon to" in explicit reference to supporting Plaintiff. Dr. Mulvihill had previously displayed inexplicable biases towards Plaintiff in the past by, for instance, retroactively accessing and criticizing Plaintiff in a performance review for a rotation she never even supervised Plaintiff on.

47. As another example, in the winter of 2023, Dr. Mulvihill was the only committee member who voted against Plaintiff's selection for the Women's Mental Health Fellowship, despite Plaintiff's qualifications for the position. Dr. Mulvihill voted in favor of non-Muslim, non-Pakistani residents of the same fellowship, including residents less qualified than Plaintiff.

48. In a residency-wide meeting on or about October 13, after Plaintiff resigned from her Chief Resident position, Dr. Kimchi sarcastically announced that he supports Plaintiff's "voice of the marginalized," and took credit for nominating her for an award the former Program Director actually nominated her for. Following the meeting, several of Plaintiff's co-residents reached out to Plaintiff and apologized on behalf of Dr. Kimchi for his behavior during the meeting.

49. Plaintiff filed a formal complaint on October 20, to the Office of Access and Equity ("OAE"). Plaintiff named Program Director Dr. Kimchi, Associate Program Director Dr. Cooper, and Resident Training Director Dr. Mulvihill in the complaint, alleging that she was discriminated against because of her identity as a South Asian Muslim woman.

50. Upon information and belief, Drs. Kumar, Kimchi, Cooper, Mulvihill and other faculty members like Dr. Christopher Holden and Dr. Daniejela Stonjanac were made aware of Plaintiff's complaints of discrimination.

51. Defendants' hostility towards Plaintiff worsened and Plaintiff continued to complain internally.

### Continued Discrimination, Retaliation, and
### Mistreatment Following Association of Plaintiff with Palestinians in Gaza

52. On or about November 13, 2023, Director of the Women's Mental Health Fellowship, Dr. Stonjanac reported Plaintiff to Program leadership because of a delayed patient note. This was uncharacteristic of faculty who routinely receive minor note delays from their medical residents.

53. Amid the ongoing Israeli military offensive in Gaza, Plaintiff informed Dr. Stojanac in writing that she had close friends in Gaza, Palestine and that this had affected her ability to complete this patient note. Upon information and belief, Plaintiff's note about Gaza was shared with Program leadership and Defendants' faculty, including Drs. Cooper and Kimchi.

54. After Plaintiff had submitted the note, Dr. Cooper emailed Plaintiff reminding her of her duty to submit patient notes in a timely manner and suggesting that she take a leave of absence because of the single outstanding patient note.

55. Prior to Plaintiff's complaints of discrimination, Plaintiff had from time to time submitted a late patient note without having been reported to program leadership or advised to take leave. Upon information and belief, Plaintiff's co-residents, who did not share Plaintiff's protected characteristics, routinely submit late patient notes for several patients at a time without being reported to or reprimanded by the program director or vice chair of the department.

56. On or about November 21, out of fear that the escalating scrutiny in this clinic would jeopardize her residency training, Plaintiff resigned from the Women's Mental Health Fellowship.

57. Defendants' treatment of Plaintiff significantly worsened after her disclosure and explicit association with Palestinians.

58. One day after her disclosure, in a department-wide meeting on November 14, 2023, Dr. Kimchi singled out Plaintiff in front of the entire department's faculty and medical residents, and requested that she explain the reason for her September 29 resignation to the department, even though the chief residency vacancy had already been filled.

59. Following this meeting, multiple residents and even faculty members again reached out to Plaintiff to apologize to her about Dr. Kimchi's comments and requests in the meeting.

60. In or about November and December of 2023, Dr. Cooper began a pattern of restricting Plaintiff's ability to teach selected didactic classes that senior residents either routinely taught or were expected to teach as part of their residency training. At times, Dr. Cooper used the excuse that Plaintiff had resigned as Chief Resident, even though senior residents who were not Chief Resident routinely taught lectures as a part of the Emergency Psychiatry and Problem Based Learning ("PBL") courses medical students, interns, and medical residents took

61. For example, in December of 2023, Dr. Cooper cancelled a lecture Plaintiff was scheduled to teach about diversity as well as a course on burnout as part of the Emergency Psychiatry curriculum being taught to first year trainees, despite her having taught the classes successfully in the past. Upon information and belief, Dr. Cooper told another medical resident that he did not want Plaintiff to share her experiences and that the trainees did "not need to learn about DEI stuff so early on in their training." Dr. Cooper also expressed over e-mail that he was concerned about her teaching these specific courses given her complaints to Defendants. Dr. Cooper continued to restrict Plaintiff from teaching over the next few months.

62. Ironically, Dr. Kimchi praised Plaintiff's teaching later in the year, stating that her course development was a model for other teaching.

63. Over the next several months, Plaintiff continued to file complaints with the OAE as well as other internal offices as the hostility worsened.

64. According to Defendants, on December 12, 2024 Dr. Kimchi launched a complaint of harassment and discrimination against Plaintiff with the OAE. In his complaint, he accused Plaintiff of antisemitism and stated that Plaintiff discriminated against him as an Israeli Jew.

65. At the time this complaint was made, Plaintiff did not know Dr. Kimchi was Israeli. In fact, Plaintiff only learned about Dr. Kimchi's accusation and complaint more than a year later, on or about February 21, 2025, long after she had graduated from her residency program. Defendants only disclosed Dr. Kimchi's antisemitism accusation to Plaintiff in Defendants' EEOC position statement in response to Plaintiff's EEOC charge of discrimination.

66. From what Plaintiff is able to glean from Defendants' summary of Dr. Kimchi's complaint, it was based on nothing other than Plaintiff's own discrimination complaints against Dr. Kimchi (framed as Plaintiff having "openly complain[ed] about Dr. Kimchi's leadership") and her association with Palestinians. With respect to the latter grievance, Defendants report that Dr. Kimchi "did not feel comfortable or safe working with Plaintiff" after she expressed disappointment that no faculty reached out to her to offer support to her after she resigned from her chief resident position and while she was being impacted by the war in Gaza. Dr. Kimchi reported this complaint as "offensive and threatening."

### Continued Discrimination and Retaliation

67. Upon information and belief, on or about December 21, 2023, Plaintiff was the subject of a Clinical Competency Committee meeting. In that meeting, Dr. Kimchi solicited and encouraged faculty members to share performance or professionalism concerns about Plaintiff with him.

68. On or about December 29, 2023, Plaintiff was informed that Dr. Kimchi would not see patients in conjunction with any medical residents on December 29, the only day that Plaintiff was scheduled to work with him on clinical inpatient duties.

69. In or about January of 2024, Dr. Holden refused Plaintiff's request to reassign a patient who himself repeatedly requested a male provider, despite Plaintiff's having pointed out reason for concern that the patient posed a safety risk to female providers, and despite the availability of alternative providers. Upon information and belief, comparable requests were accommodated for residents who had not complained of discrimination and who did not share Plaintiff's protected characteristics.

70. On or about January 16, Plaintiff resigned from Dr. Holden's clinic, citing her concerns regarding Defendants' forced employment-based assignment that posed a gender-based safety concern.

71. Upon information and belief, on or about January 19, in another Clinical Competency meeting, Program faculty and leadership discussed the reason Plaintiff was required to treat the male patient who expressed strong thoughts of sexually assaulting women. Although a member of the faculty noted that male faculty members might not fully appreciate the situation from a woman's perspective, Drs. Kimchi and Cooper uniformly defended Dr. Holden's conduct and completely rejected Plaintiff's concerns.

72. On or about January 22, Dr. Kimchi emailed Plaintiff to inform her that the supervising attending physician, Dr. Christopher Holden, specifically requested not to work with Plaintiff. Plaintiff was substantially disadvantaged because of Dr. Holden's refusal to see patients with her, leaving her without a consistent clinical supervisor and forcing her to wait in the clinic for willing faculty members to become available so that she could complete required patient encounters.

73. As part of their medical training, medical residents must work under an attending supervising physician in order to progress through the program. Upon information and belief, neither Dr. Kimchi nor Dr. Holden ever refused to work with other resident trainees who did not complain of discrimination or share Plaintiff's protected characteristics.

74. In or about January of 2024, Plaintiff began receiving death threats from a patient in the clinic because of required disclosures she made when he was expressing suicidal thoughts. Despite the seriousness of the threat and the resulting involvement of hospital leadership and security personnel, Defendants provided little to no support to Plaintiff, failed to meaningfully assist her in navigating the reporting process, and largely left her to address the situation on her own. Upon information and belief, the Program normally provided support to medical residents who did not similarly complain of discrimination, and who did not share Plaintiff's protected characteristics, when they faced difficult patient-related issues during their training.

75. On or about January 23, 2024, a representative from the OAE met with Plaintiff about her ability to teach PBL classes, which senior residents were expected to teach. Plaintiff updated the OAE regarding the continued retaliation and hostility she faced from the Program.

76. Despite reviewing her teaching materials, UI Health continued to prohibit Plaintiff from teaching. Plaintiff was restricted from teaching in both January and February of 2024.

77. Upon information and belief, several members of the Program's leadership and faculty were made aware of Plaintiff's discrimination and retaliation complaints.

78. Plaintiff's co-residents who are non-Pakistani, non-Muslim, and male, and who did not similarly complain of discrimination, continued to teach their PBL sessions even after Plaintiff was restricted. Nor were Plaintiff's co-residents subject to the same scrutiny over the content of their teaching materials prior to permitting them to teach.

79. Upon information and belief, in or about March of 2024, Dr. Tamayo told prospective faculty candidates that Plaintiff was causing problems and "chaos" in the department.

80. In or about March of 2024, Plaintiff was scheduled to deliver a required Grand Rounds presentation. In an e-mail to Program leadership, Dr. Cooper warned Plaintiff's faculty supervisor that Plaintiff had a "history" of complaining against the Program and that if he had

14

any issues, the Program would support him. Plaintiff was required to submit a synopsis of her presentation for review before she was permitted to present.

81. Upon information and belief, Dr. Cooper dishonestly told one prospective medical resident that a senior medical resident at UI Health pressured a Jewish program director to issue a statement on the war on Gaza. Based on the identifying information Dr. Cooper provided, the prospective medical resident understood Dr. Cooper to be referring to Plaintiff.

82. Contrary to Dr. Cooper's alleged statement, Plaintiff did not pressure her Jewish program director to issue a statement on the war on Gaza.

83. Three senior medical residents, who are not Muslim, not Pakistani, and who did not similarly associate with Palestinians and launch discrimination complaints, were offered faculty positions within the Department upon graduation. Plaintiff was not offered a faculty position, despite it being standard for UI Health to offer such positions to residents who served as chief residents.

84. In or about March of 2024, Dr. Kimchi stepped down from his position as the program director, after which Dr. Cooper assumed the position.

85. Between April of 2024 through the end of June of 2024, Plaintiff took time off from her residency program in order to separate herself from the increasingly hostile environment and to address her wellbeing. Plaintiff graduated from the residency program on June 30, 2024.

86. On or about November 27, 2024, Plaintiff filed an EEOC charge alleging discrimination against Defendants.

87. Following graduation, Plaintiff had difficulty obtaining employment.

88. Upon information and belief, Defendants' leadership, including Program Director Dr. Cooper routinely ignored or declined to complete credentialing and reference paperwork in response to third-party inquiries and potential employers Plaintiff applied to and, in at least one instance, cited to the brevity of his tenure as Program Director as the reason. Upon information and

belief, Dr. Cooper routinely responded to similar inquiries on behalf of current and former medical residents who did not share Plaintiff's protected characteristics.

89. Defendants' conduct directly impeded Plaintiff's ability to secure employment.

90. As a result of Defendants' treatment of Plaintiff, Plaintiff suffered from severe insomnia requiring medication, worsened mood, anhedonia, weight gain, lethargy, dissociative episodes observed by friends and family, and a significant worsening of chronic migraines that required a return to physical therapy and initiation of several new medications.

91. The emotional distress Plaintiff sustained from the discrimination and retaliation she experienced required ongoing professional treatment beyond the conclusion of her residency.

**COUNT I**
**42 U.S.C. § 1981**
**Race and National Origin Discrimination**
**(*All Defendants*)**

92. Each paragraph of this Complaint is incorporated as if fully stated herein.

93. Plaintiff is of South Asian race, ethnicity, and ancestry, and is a member of a racial group protected by 42 U.S.C. § 1981.

94. At all relevant times, Defendants were aware of Plaintiff's race, ancestry, and ethnicity.

95. Defendants subjected Plaintiff to a hostile work environment, constructively discharged her from her chief residency role and other roles as a trainee, and denied her the opportunity to join Defendants as a member of the faculty subsequent to the completion of her residency program because of Plaintiff's ancestry and ethnicity. But for Plaintiff's ancestry and ethnic characteristics, Defendants would not have subjected her to a hostile work environment, constructively discharged her, and denied her opportunities both during her residency and subsequently.

96. Defendants denied Plaintiff several material terms and conditions of employment that it affords to employees who do not share her race.

16

## COUNT II
### Race, National Origin, Religion, and Sex Discrimination
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1)
### (*UI Health*)

97. Each paragraph of this Complaint is incorporated as if fully restated herein.

98. Plaintiff is a South Asian, Pakistani, Muslim woman. Dr. Kimchi also either perceived Plaintiff to be Arab or conflated individuals of Arab and Pakistani Muslim origin.

99. At all relevant times, Defendants were aware of Plaintiff's protected characteristics.

100. During Plaintiff's employment, Defendants displayed hostility towards her because of her protected characteristics and subjected Plaintiff to a hostile work environment. For example, Defendants subjected Plaintiff to additional scrutiny, reduced support, additional responsibilities, and adverse treatment that they did not impose on similarly situated residents who are not women, Muslim, South Asian, or Pakistani.

101. The hostile work environment created by Defendants ultimately resulted in Plaintiff's constructive discharge as Chief Resident and from various clinics and teaching opportunities she participated in as a part of her training. Defendants filled the vacant Chief Resident role with an employee who did not share Plaintiff's protected characteristics.

102. Additionally, Defendants failed to offer Plaintiff employment as an academic faculty member because of her protected characteristics.

103. Defendants treated Plaintiff differently than non-Pakistani, non-Muslim, and male employees.

## COUNT III
### Discrimination on the basis of Association with Palestinians
### Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1)
### (*UI Health*)

104. Each paragraph of this Complaint is incorporated as if fully restated herein.

17

105.    Title VII prohibits discrimination based on an employee's association with persons of a particular national origin, race, and/or ethnicity.

106.    Defendants subjected Plaintiff to a hostile work environment and constructively discharged her from her role as chief resident as well as from her role in fellowships and/or clinics because of Plaintiff's association with Palestinians. Defendants also failed to offer Plaintiff employment as an academic faculty member because of her association with Palestinians.

107. Defendants imposed different expectations, standards, and treatment on its residents who did not have associations with Palestinians.

108. Plaintiff's perceived association with Palestinians was a motivating factor in the adverse actions Plaintiff suffered.

**COUNT IV**
**42 U.S.C. § 1981**
**Discrimination Because of Association with Palestinians**
**(All Defendants)**

109.   Each paragraph of this Complaint is incorporated as if fully restated herein.

110.   Section 1981 prohibits discrimination based on an employee's association with persons of a particular race or ethnicity.

111. Palestinians are members of the Arab national origin group, a distinct racial group for the purpose of the Civil Rights Act of 1866.

112. Plaintiff expressed her associations with Palestinians who live in Gaza and Program leadership was made aware of her association.

113. Dr. Kimchi characterized Plaintiff's request for support based on her close connection with Palestinians in Gaza as "offensive" and used that request as a basis for his bad-faith complaint that Plaintiff was "antisemitic."

114. Defendants subjected Plaintiff to a hostile work environment, constructively discharged Plaintiff from her chief resident role as well as from other clinical and teaching roles, and failed to offer her a faculty position after graduation because of Plaintiff's association with Palestinians.

115. But for Plaintiff's association with Palestinians and with Palestine, Defendant would not have taken adverse actions against Plaintiff.

## COUNT V
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a)
### Retaliation
### (*UI Health*)

116. Each paragraph of this Complaint is incorporated as if fully restated herein.

117. Plaintiff engaged in protected activity as defined by Title VII when she complained about discrimination

118. Following Plaintiff's protected activity, Defendants subjected her to both a hostile work environment and other adverse actions, including but not limited to being constructively discharged from her chief resident position and fellowship, as well as other clinics she served in.

119. These adverse actions would not have occurred were it not for Plaintiff's protected activity.

## COUNT VI
### 42 U.S.C. § 1981
### Retaliation
### (*All Defendants*)

120. Each paragraph of this Complaint is incorporated as if fully restated herein.

121. Plaintiff engaged in protected activity as defined by Section 1981 when she complained to Defendants about discrimination.

122. Defendants were aware of Plaintiff's complaints.

123. Following Plaintiff's protected activity, Defendants subjected her to both a hostile work environment and other adverse actions, including but not limited to being constructively discharged from her chief resident position and fellowship.

124. Defendants' conduct impaired Plaintiff's ability to enjoy the benefits, privileges, terms, and conditions of her employment relationship and her opportunity to enter into future employment relationships.

125. These adverse actions would not have occurred were it not for Plaintiff's protected activity.

## COUNT VII
### Retaliatory Discharge under the Illinois Whistleblower Act

126. Each paragraph of this Complaint is incorporated as if fully restated herein.

127. On or about November 7, 2023, Plaintiff also reported the smell and related sounds of exhaust fumes in an outpatient clinical building to Defendants, who are government entities.

128. Plaintiff reasonably and in good faith believed that the fumes posed a safety concern that violated building and hospital regulations, and that they posed a substantial and specific danger to employees, patients, public health, and safety.

129. At all relevant times, Plaintiff was an employee within the meaning of the Illinois Whistleblower Act.

130. In or about November of 2023, Plaintiff disclosed information to a public body and/or governmental agency concerning conduct that she reasonably believed violated OSHA.

131. Defendants were aware of Plaintiff's protected disclosures.

132. After Plaintiff engaged in protected activity, Defendants subjected Plaintiff to retaliatory actions, including heightened scrutiny, hostility, interference with training opportunities, exclusion from professional opportunities, interference with potential job opportunities, and other adverse treatment described herein.

133. Defendants' actions were taken because Plaintiff engaged in protected activity protected by the Illinois Whistleblower Act.

134. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages, including economic losses, emotional distress, and other compensatory damages.

### Request for Relief

WHEREFORE, Plaintiff respectfully requests:

- All past, present and future lost earnings, benefits, and renumeration Plaintiff would receive if Defendants had not taken adverse actions against Plaintiff.

- Prejudgment interest;

- Compensation for emotional distress;

- Compensation for physical sickness;

- Liquidated damages;

- A civil penalty of $10,000;

- Punitive damages;

- Attorneys' fees and costs; and

- Such other relief as law and justice allow.

### JURY DEMAND

Plaintiff requests a trial by jury with respect to any issues so triable.

DATED: June 21, 2026

Respectfully submitted,

*/s/ Yusra Gomaa*

*/s/ Danya Rashed*

Attorneys for Plaintiff
Yusra Gomaa (yusra@kapitangomaa.com)
Atty No. 6299883
Danya Rashed (danya@kapitangomaa.com)

Atty No. 6346374
Kapitan Gomaa Law, P.C.
P.O. Box 46503
Chicago, Illinois 60646
(312) 566-9590